# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:11-CR-35-TLS |
| | ) | |
| BOOKER T. SEWELL | ) | |

## OPINION AND ORDER

Police obtained a warrant to search a residence at a particular address on Sawmill Woods Court in Allen County, Indiana (the Residence). During the search, the police found incriminating evidence. The Defendant, Booker T. Sewell, filed a Motion to Suppress [ECF No. 21] seeking the suppression of evidence obtained during the search. For the reasons set forth in this Opinion and Order, the Court is unpersuaded by the Defendant's arguments and denies his Motion to Suppress. Also before the Court is a Stipulation [ECF No. 28] filed by the Defendant and the Government. For reasons set forth in this Opinion and Order, the Court will accept the Stipulation in order to correct particular facts in the record.

## PROCEDURAL BACKGROUND

The Defendant is charged in a two-count Indictment with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(e), and one count of maintaining a place for the purpose of distributing and using a scheduled II controlled substance, cocaine, and a schedule I controlled substance, marijuana, in violation of 21 U.S.C. § 856(a)(1). On July 13, 2011, the Defendant filed a Motion to Suppress [ECF No. 21]. In this Motion, the Defendant seeks the suppression of evidence obtained during the search. The Motion challenges the probable cause affidavit attached to the Application for a Search Warrant (the Affidavit),

arguing that the Affidavit did not contain sufficient facts upon which the magistrate judge could have found probable cause to search the Residence, that the Affidavit contained no facts to support the conclusion that the Defendant was involved in any criminal activity, that the Affidavit failed to establish a nexus between any alleged criminal activity and the Residence, and that the Affidavit failed to establish that the Defendant was either residing in or associated with the Residence. The Defendant additionally argues in the Motion that the Affidavit contained an inaccuracy regarding the existence of a Protective Order allegedly in place at the time of the warrant. This particular factual issue has been resolved by the parties through the Stipulation filed with the Court.

The Defendant initially supported the Motion with a Memorandum [ECF No. 22] also filed on July 13. The Government filed a Response in Opposition to the Motion [ECF No. 23] on July 21. The Court then held two telephonic conferences, one on July 26 and one on August 4, during which the parties discussed their attempts to resolve the factual inaccuracy in the Affidavit and their plan to file a stipulation to resolve that inaccuracy. During the telephonic conference held on August 4 the Court gave the parties a deadline of August 15 to file such a stipulation. The Court also gave the parties deadlines for additional briefing on the Motion. The Defendant was given until September 16 to file a Supplemental Brief, the Government was given until October 17 to file a Response, and the Defendant was given until November 1 to file a Reply.

The parties filed the Stipulation [ECF No. 28], along with supporting documents, on August 15. The Defendant filed a supplemental Brief in Support of the Motion to Suppress [ECF No. 29] on September 21. The Government filed its Response [ECF No. 30] on October 18.

On November 3, the Court held a telephonic status conference with counsel regarding the

supplemental briefing supporting and opposing the Defendant's Motion to Suppress. The Court held this conference after the November 1 deadline for the Defendant to file a Reply. During that call counsel for the Defendant stated that he would file no further briefing. The Court proposed that the 30 days provided in the Speedy Trial Act for taking the Motion under advisement, *see* 18 U.S.C. § 3161(h)(1)(H), should run from the last day given to the Defendant to respond to the Government's brief, as the Court had contemplated that such a filing would be forthcoming. During the conference, Counsel for the Defendant agreed with the Court in this regard and waived any Speedy Trial Act objection to the Court taking the arguments presented by the parties under advisement for 30 days, beginning November 1.

**FACTUAL BACKGROUND**[1]

On March 31, 2011, U.S. Magistrate Judge Roger B. Cosbey signed a Search and Seizure Warrant for the Residence. Federal Bureau of Investigation Special Agent James Keszei signed the Application for Search Warrant and attached to it an Affidavit, also signed by Agent Keszei, purporting to establish probable cause to search the Residence. The Magistrate Judge based his finding of probable cause to search the Residence on this Affidavit.

The Affidavit establishes a basis for Agent Keszei's expertise in matters relating to drug investigations and his basis for knowledge of the events and persons described in the Affidavit. The investigation that led to the Application for a Search Warrant for the Residence began with a

---

[1] The factual summary which follows is drawn, except where otherwise noted, from the Affidavit. The Defendant does not allege, for purposes of this Motion, that the facts presented in the Affidavit were false. Rather he alleges that Federal Bureau of Investigation Special Agent James Keszei drew his opinions in the Affidavit without a sufficient factual basis. The Court, therefore, has attempted to separate statements by the parties under investigation from the descriptions and explanations of those statements provided within the Affidavit by Agent Keszei.

series of controlled purchases of crack and powder cocaine in February, April, and June 2010 through one confidential source. A second confidential source undertook additional controlled purchases of cocaine in Fall 2010. These controlled purchases led to court authorization of telephone surveillance of several individuals, eventually including, relevant to the Defendant's case, Silvestre Castaneda (Castaneda). Statements presented in the Affidavit provided a significant basis for the conclusion that Castaneda imported cocaine, in kilogram quantities, into the Fort Wayne area and sold it to others for distribution. Castaneda repeatedly changed his cell phone number over the course of the investigation likely out of a concern that he was under law enforcement surveillance. The conversations between Castaneda and the Defendant described below took place, therefore, on several different telephones used by Castaneda.

On February 1, 2011, the Defendant called Castaneda and asked to meet with him in person. Castaneda responded that he was out of town driving to California but that the Defendant could "go talk to my friend . . . my big friend." Agent Keszei stated he believed the reference to "my big friend" was to a particular person known to be associated with Castaneda because of his "height and his nickname of 'El Grande,' Spanish for 'The Big One.'" On February 14, 2011, an intercepted call indicated that the Defendant was coming to Castaneda's apartment. After that conversation was intercepted, a black male was observed entering and, within 10 minutes, exiting Castaneda's apartment. Investigators were not able to positively identify this individual, but Agent Keszei stated that the vehicle driven by this individual "had been associated with [the Defendant] in past police involvement according to a [Fort Wayne Police Department (FWPD)] database."

On February 17, 2011, Castaneda called the Defendant. The Defendant said he was

"going to to go over there in a couple of minutes." Castaneda asked the Defendant to "tell . . . your brother Tone, like, give me . . . the other titles." Agent Keszei interpreted the word "titles" in this context to mean "money." He explained that he believed the phone call regarded money owed to Castaneda by the Defendant's brother from a drug transaction. Agent Keszei stated it was his opinion that the conversations indicated that the Defendant wanted to meet with Castaneda to discuss a drug transaction in person but provided no quotes from the conversation which directly supported this assertion. On February 18, 2011, Castaneda called the Defendant to arrange a meeting later that day. According to Agent Keszei the Defendant "wanted to wait" and responded "soon as it get a little, get kinda dark." Agent Keszei stated that it was his opinion that the Defendant's desire to wait until it was dark out to meet was consistent with meeting for a drug transaction as it indicated a desire to avoid surveillance.

On February 21, 2011, the Defendant spoke with Castaneda on the telephone again discussing money owed to Castaneda by one of his brothers who Castaneda was having trouble contacting. The Defendant also stated during that call: "I was saying if I can come to get that one tonight. But the snow is out." Agent Keszei stated that he believed "that one" to mean "a quantity of cocaine."

On March 1, 2011, the Defendant called Castaneda. The Defendant asked, "Yeah you got the one[?]" Castaneda told the Defendant that he needed to pay the bills to "my friend" which Agent Keszei interpreted as meaning his "drug supplier." Agent Keszei stated that he believed this conversation indicated that Castaneda was telling the Defendant that Castaneda needed money from the Defendant before he could resupply him with cocaine. Castaneda stated: "Yeah I need to give like, he's asking me for, five more, but I don't have more in my pocket, so, I don't

5

know, your brother say he gonna give me two more today, and . . . I don't know, I am talk with your other brother, with Tone, I am talk with him, he owe me something too." Castaneda also said, "So I don't know, do you have the . . . three man?" The Defendant responded, "Yeah . . . I have something for you." Castaneda then asked to pick it up. Agent Keszei stated it was his opinion that this conversation was consistent with a pattern previously followed by Castaneda of collecting money from several individuals to use to purchase drugs from his supplier. Castaneda then traveled to California.

On March 8, 2011, the Defendant called Castaneda asking if he had returned and Castaneda replied "in two more days." The Defendant stated, "OK, I'll be ready," which Agent Keszei indicated that he believed meant "for the next drug transaction." Castaneda stated "OK, I am going to bring some OK? When I'm there." On March 10, 2011, investigators intercepted a shipment of three kilograms of cocaine from California to Fort Wayne described in telephone calls between Castaneda and others. Intercepting this package supported the allegation that Castaneda was shipping cocaine to Fort Wayne for distribution and that the purpose of his trip to California was to purchase this cocaine.

On March 12, 2011, electronic surveillance indicated that Castaneda went to the Residence. On the same day, Castaneda made several phone calls related to shipping cocaine to the Fort Wayne area. On March 13, 2011, the Defendant called Castaneda. On that call Castaneda stated "I'm waiting on my friend man, he call me and . . . he told me now, Monday in the morning tomorrow. But I call you for sure. . . . He called me and, and he stopped a little bit in, some town, but, but he come tomorrow . . . But, I call you man, I call you for sure when I have the stuff." Agent Keszei interpreted "the stuff" to mean "cocaine."

On March 14, Castaneda called the Defendant and asked him for "like 2, uh 2 grand for pay something . . . I don't know if you can help me man." Agent Keszei stated that the Defendant responded that he would stop by Castaneda's residence. On March 15, the Defendant called Castaneda and asked if Castaneda was ready. Castaneda said "I'm waiting man. I'm not ready . . . but uh, when I'm, I'm ready for sure, I, I call you guys." Castaneda also said he needed money to "pay like some bills." The Defendant stated "Well I'll, I'll go pick something up later on and I'll call you about 9."

With regard to the relationship between the Defendant and the Residence, the Affidavit stated that an investigator contacted the condominium complex property manager who confirmed that the occupant of the Residence was listed as Martine Sheree Sewell (Martine) who was "known to be associated with [the Defendant] based upon an unrelated FWPD drug buy in December of 2009." The Affidavit contained information that three separate domestic dispute events in 2010 and 2011 associating the Defendant with the Residence were found in the Spillman database, a database which tracks contacts with law enforcement in the Fort Wayne area. *See United States v. Govan*, No. 1:08–CR–12–TS, 2008 WL 5101331, at *2, n.1 (N.D. Ind. Dec. 1, 2008) (describing the Spillman database). The Affidavit, in reliance on the Spillman database, indicated that Martine had obtained a protective order against the Defendant. The Stipulation entered by the parties and the documents provided with it, however, demonstrates that no such protective order was in place at the time the Affidavit was signed. Rather, Martine had voluntarily dismissed her petition for a protective order two days after filing the petition to put the order in place. The database and the Affidavit contained an inaccuracy with regard to the existence of the protective order at the time of the search, an error now corrected in the record by

7

the Stipulation.

**ANALYSIS**

A judge's duty in reviewing a search warrant is limited. The duty of a reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. "Probable cause denotes more than a mere suspicion, but does not require certainty." *United States v. Fleischli*, 305 F.3d 643, 651 (7th Cir. 2002) (quotation marks and citations omitted). A search warrant may issue "even in the absence of [d]irect evidence linking criminal objects to a particular site." *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) (quotation marks and citations omitted). "The [judicial officer] to whom the warrant application is directed is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense, and the [judicial officer] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *Id.* (quotation marks and citations omitted).

The Defendant's argument that the statements contained in the Affidavit were insufficient to support probable cause is unpersuasive. The Defendant's conversations with Castaneda indicate that the two were involved in an ongoing series of exchanges involving money and some other product. The Magistrate Judge acted reasonably in relying on the broader context of information in the Affidavit substantiating the claim that Castaneda was dealing in cocaine to draw the inference, with or without Agent Keszei's opinion, that such conversations related to drug trafficking. It was reasonable for the Magistrate Judge to conclude, for example, that when

Castaneda told the Defendant he would call him when "the stuff" arrived, Castaneda was talking about cocaine.

The Defendant's principal argument is that, divorced from context and from Agent Keszei's interpretations, the statements made by the Defendant to Castaneda could be read as innocent. However, the Defendant's statements cannot be viewed in isolation from the broader context of information contained in the Affidavit and the existence of innocent explanations for the Defendant's statements is not sufficient to defeat a finding of probable cause. *See United States v. Figueroa-Espana*, 511 F.3d 696, 703 (7th Cir. 2007) ("[E]ven when innocent explanations exist for individual factors taken separately, reasonable suspicion may arise when the factors are considered together."). A desire to wait to meet until it gets dark could, as the Defendant argues, have some innocent explanation. But, the Magistrate Judge was not required, given the broader context of allegations concerning Castaneda's drug trafficking, to draw the inference that the two were having a conversation which the Defendant, for some innocent reason, wanted to wait to continue in person until it was dark out. Rather, the Magistrate Judge was reasonable in relying on such a statement as evidence that the conversation related to drug trafficking because so many of Castaneda's conversations and so much of his activity related to the distribution of cocaine.

The Defendant argues that, because the Castaneda spoke more openly about drug sales with others on the telephone, the Magistrate Judge should have concluded that Castaneda did not have "any trouble discussing drugs and money with the people he was involved in the conspiracy with." (Br. Supp. Mot. Suppress 9, ECF No. 29.) The Magistrate Judge, therefore, in the Defendant's view, should have drawn the conclusion that the lack of any explicit reference to

9

drugs in conversations between the Defendant and Castaneda indicated that these conversations were innocent. This argument does not persuade the Court because it overlooks the efforts by Castaneda and others throughout the evidence presented in the Affidavit to speak in code and avoid explicit references to particular drugs in telephone conversations. It similarly ignores Castaneda's efforts to avoid surveillance by law enforcement and would deny the Magistrate Judge reasonable reliance on testimony by an officer experienced in interpreting the code terms and other efforts used by those involved in drug trafficking to avoid detection.[2]

In the Affidavit, Agent Keszei stated that, after a phone call between Castaneda and the Defendant indicating that the Defendant was going to meet with Castaneda, investigators saw a black male enter Castaneda's apartment. Soon afterwards this individual exited the apartment and entered a 2007 gray Toyota Camry with a particular license plate number stated in the Affidavit. Agent Keszei stated that the "same vehicle had been associated with [the Defendant] in past police involvements according to a FWPD database." The Defendant argues that this assertion regarding a past association of the car with the Defendant was so vague it required the Magistrate Judge to "accept the judgment of the Agent without any factual basis for making a determination" of his own. (Br. Supp. Mot. Suppress 6.) This argument fails to acknowledge the additional fact that the recorded phone call evidence indicated that the Defendant was coming to

---

[2] The Court notes that the Defendant raises similar contentions over several other statements outlined in the factual background including, among others, Castaneda's instruction that the Defendant could "go talk to his friend," the Defendant's statement to Castaneda that he would "be ready," Castaneda's statement to the Defendant that he would call the Defendant when he was ready, and Castaneda's statements that he would call the Defendant once he had "the stuff." The Court finds that the totality of the allegations presented in the Affidavit were sufficient to support a finding of probable cause by the Magistrate Judge. Because the Government need only show that the Magistrate Judge had substantial evidence on which to rely given the totality of the circumstances, the Court need not analyze or make a final determination on every contention raised by the Defendant regarding individual statements in the Affidavit. The Court notes that it would apply a nearly identical analysis as that above to these additional contentions presented by the Defendant.

Castaneda's residence to meet with him.

The Defendant argues that there was no evidence to associate the Residence with drug dealing operations of Castaneda or others described in the Affidavit or even with the Defendant himself. The Magistrate Judge, however, reasonably relied on evidence that Castaneda drove to the Residence soon after he had returned from a trip to California taken for the purpose of acquiring cocaine and on a day during which he had been on the phone discussing drug trafficking, to find probable cause. Additionally, "[i]n the case of drug dealers evidence is likely to be found where the dealers live." *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996) (citing *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). While some information in the Affidavit, now corrected in the record, was not accurate, the Affidavit contained sufficient accurate information to permit the reasonable inference that the Defendant lived at or was associated with the Residence. The Affidavit indicated that the Defendant had been involved in a series of domestic disputes leading to police involvement at that address and that investigators had confirmed that Martine, also involved in those disputes, still lived at the Residence. The combination of evidence that Castaneda visited the Residence, that the Defendant had lived at, or was associated with, the Residence, and that the Defendant was involved in drug trafficking was sufficient to support a finding of probable cause to search the Residence.

"A magistrate's determination of probable cause 'is to be given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.'" *United States v. Newsom*, 402 F.3d 780, 782 (7th Cir.

2005) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)); *see also United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008) (holding that a reviewing court will "defer to the determination of the warrant-issuing judge that probable cause existed so long as 'there is substantial evidence in the record supporting the judge's decision'" (quoting *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002)). The Defendant has not pointed to any defect in the probable cause affidavit that would justify overruling the Magistrate Judge's determination that it was reasonable to believe that evidence related to drug trafficking would be located at the Residence.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Defendant's Motion to Suppress [ECF No. 21] and ACCEPTS the Stipulation [ECF No. 28].

SO ORDERED on November 17, 2011.

       s/ Theresa L. Springmann  
       THERESA L. SPRINGMANN  
       UNITED STATES DISTRICT COURT