UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO.: 1:11-CR-35-HAB |
| ) | |
| BOOKER T. SEWELL ) | |

## OPINION AND ORDER

Booker T. Sewell ("the Defendant") filed a motion seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) (ECF No. 275) along with three supplements,[1] the latest of which was filed on February 4, 2021 (ECF Nos. 280, 281, and 286).[2] The Government has responded and the Defendant replied making the motion ripe for consideration. (ECF Nos. 282, 285). For the following reasons, the Defendant's motion will be DENIED.

## PROCEDURAL BACKGROUND

As set forth in paragraphs 13-23 of the presentence investigation report (ECF No. 209), from February through October 2010, law enforcement made controlled purchases of cocaine from a mid-level dealer. These controlled buys established cause for court-authorized wiretaps of telephones (and subsequently spin-off wiretaps) belonging to individuals in the cocaine distribution network. These initial wiretaps led to the seizure of approximately five kilograms of

---

[1] The first two supplements include 132 pages of the Defendant's medical records from the Bureau of Prisons. The third supplement appears to be an additional argument in reply to the Government's brief.

[2] Pursuant to this Court's General Order 2020-11, the Court referred the Defendant's motion to the Northern District of Indiana Federal Community Defenders, Inc. ("FCD") for it to consider representing the defendant with respect to his motion. (ECF No. 278). Subsequently, the FCD filed a Notice indicating that it would not be appearing on the Defendant's behalf. (ECF No. 279).

cocaine from two separate shipments originating from Mexico and shipped from southern California.

Wiretap intercepts were eventually recovered between the Defendant and a distributor discussing, among other things, the purchase of kilogram amounts of cocaine. Subsequently, in April 2011, the Defendant's residence was searched pursuant to a warrant. A loaded handgun, cash in excess of $20,000 (some of which was located in a safe in the dishwasher), multiple containers and bags with marijuana, drug ledger sheets, scales, kilogram cocaine packaging and cocaine cutting agents were all located in the house.

The Defendant was indicted for, and later convicted of, being a felon in possession of a firearm (18 U.S.C. §922(g)(1)), and maintaining a place for the purpose of distributing and using cocaine and marijuana (21 U.S.C. §856(a)(1)). After a second re-sentencing hearing, the Defendant was sentenced to 312 months' imprisonment followed by one year of supervised release.[3] The Defendant is presently incarcerated at FCI Gilmer in Glenville, West Virginia, with an anticipated release date of June 7, 2033.

## **DISCUSSION**

The Defendant's Motion requests compassionate release. Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed. *See* 18 U.S.C. § 3582(c). A handful of statutory exceptions exist, however, one of which allows a court to grant an inmate

---

[3]The Defendant was originally sentenced to 360 months imprisonment. (ECF No. 114). On appeal, the Defendant's conviction was affirmed, but the case was remanded for reconsideration of the terms of supervised release. (ECF No. 134). In January 2016, the Court re-imposed the same term of imprisonment and the Defendant appealed. In August 2016, the parties jointly moved for remand for another resentencing in light of *Johnson v. United States,* 576 U.S. 591 (2015). This resentencing yielded his current 312–month sentence of imprisonment. In November 2018, the Defendant moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (ECF No. 248). The Court denied his initial motion and the Seventh Circuit affirmed. (ECF Nos. 256, 267).

2

compassionate release if the inmate meets certain requirements. *See* 18 U.S.C. § 3582(c)(1)(A). Under this provision, as amended by § 603(b) the First Step Act, a court may not modify a term of imprisonment except that –

(1) in any case --

   (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—

(i) extraordinary and compelling reasons warrant such a reduction …

… and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The Government concedes that the Defendant has exhausted his administrative remedies and that his motion is properly before the Court. *See United States v. Sanford,* 986 F.3d 779 (7th Cir. 2021) (exhaustion is a mandatory claim-processing rule and must be enforced prior to proceeding on the merits). Thus, the Court turns to the substance of the Defendant's request, his contention that he has demonstrated "extraordinary and compelling reasons" for his release.

The Defendant asserts that the COVID-19 pandemic combined with his race, medical conditions and his conditions of confinement at FCI Gilmer constitute extraordinary and compelling circumstances justifying his release. (ECF No. 275). Specifically, with respect to his health, Defendant points to his high blood pressure, obesity, heart and kidney problems and prediabetic conditions.

Congress did not define "extraordinary and compelling reasons" in the statute, instead delegating the matter to the Sentencing Commission to promulgate a policy statement that

"describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement, contained in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and the accompanying Application Notes, have not been amended to reflect the First Step Act's change to § 3582(c)(1)(A) allowing prisoners to bring compassionate release claims directly before the court. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). Accordingly, "§ 1B1.13 and its application notes provide useful – but not binding – guidance to courts in determining whether a defendant has identified an extraordinary and compelling reason for compassionate release." *United States v. Hoskins*, No. 2:99 CR 117, 2020 WL 7640408, at *2 (N.D. Ind. Dec. 23, 2020) (citing *Gunn*, 938 F.3d at 1180). Indeed, "[d]istrict judges must operate under the statutory criteria–'extraordinary and compelling reasons'–subject to deferential appellate review." *Gunn,* 980 F.3d at 1181.

Using the guidance of §1B1.13 to inform the statutory criteria, the court considers the medical condition of the defendant, his age, his family circumstances, and whether there exists in the defendant's case an extraordinary or compelling reason "other than or in combination with" the other reasons described in the Application Notes.[4] Second, the Court determines whether the Defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court considers the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. 1B1.13.

---

[4]However, as *Gunn* made clear, the policy statement's requirement that the court consider whether the reduction is otherwise "consistent with this policy statement" does not limit a district judge's discretion. This is because the statute by which the district court is bound requires a reduction to be consistent with "applicable policy statements." And, the Sentencing Commission has not yet issued a policy statement "applicable" to the Defendant's request. Thus, *Gunn* held, "[a]ny decision is 'consistent with' a nonexistent policy statement." *Gunn*, 980 F.3d at 1180.

4

Additionally, when the Defendant moves for a reduction based on COVID-19, Courts have also considered: (1) the specificity of the defendant's COVID-19 concerns, (2) whether the defendant has a medical condition that makes him especially susceptible to the dangers of COVID-19, and (3) the extent that the defendant's release would mitigate or aggravate the COVID-19 pandemic. *See United States v. Council*, No. 1:14-CR-14-5-TLS-SLC, 2020 WL 3097461, at *5–7 (N.D. Ind. June 11, 2020); *United States v. Barrett*, No. 2:17-CR-1, 2020 WL 3264112, at *3 (N.D. Ind. June 17, 2020); *see also United States v. Davis*, No. 2:19-CR-74-3, 2020 WL 1951652, at *1–2 (N.D. Ind. Apr. 23, 2020) (applying similar factors to consider whether there was a "compelling reason" for pretrial release due to the COVID-19 pandemic). In the context of the COVID-19 pandemic, "§ 3582(c)(1)(A) contemplates a sentence reduction for specific individuals based on the individuals' particular circumstances of where he is housed and his personal health conditions." *See Council*, 2020 WL 3097461, at *5.

Ultimately, however, it is Defendant's burden to establish that a "compassionate release" is warranted under the statute. *United States v. Wesley*, 2020 WL 3868901, *1 (D. Kan. July 9, 2020); *see also United States v. Bright*, 2020 WL 473323, at *1 ("extraordinary and compelling" imposes a heavy burden on a defendant seeking relief under Section 3582(c)(1)(A)).

The Defendant's medical records from the BOP establish that he suffers from chronic uncontrolled hypertension, morbid obesity (BMI >38 on 1/4/2018; BMI >45.1 on 9/4/2020), and an unspecified kidney disorder/renal insufficiency. These records further reflect a "history of noncompliance with medical treatment" (Gov't Ex. 1 at 3, 8, 21, 29, 32, 33), especially as it relates to his hypertension.[5] Indeed, the medical records are replete with indications that the Defendant is non-compliant with his treatment, delays or opts not to refill prescription medications and has

---

[5] This history is well-documented throughout the records in all three of the Government's exhibits.

5

had to be placed on a "pill line" to ensure compliance with his prescription regimen. (*Id.* at 32: "He is adamant his [sic] compliant now. OK with pill line monitoring for one month."; Gov't Ex. 3 at 4: (from 9/4/2020: "Start pill line to monitor compliance.")).

Likewise, the records reflect that he is "not exercising or following any diet." (Gov't Ex. 2 at 1). Repeatedly his medical providers have counseled him on the risks of not taking his medications as prescribed and following an appropriate diet. At least one of his medical records lists the commissary items the Defendant had purchased on a single day which included high calorie, high sugar items such as soda, Tastykake honey buns, brown sugar Pop Tarts, and Snickers candy, among other things. (Gov't Ex. 2 at 2). On July 29, 2019, his medical provider noted "hx non-compliance with counseling on prognosis. Commissary still not great." (*Id.* at 8).

Despite his noted resistance and failure to adhere to the advice of his medical providers, the Defendant asserts that his medical conditions qualify as "compelling and extraordinary" under the commentary to section 1B1.13. Under that commentary, a Defendant must demonstrate either that he is suffering from a terminal illness under (A)(i); or that he has (1) a serious physical or medical condition, (2) a serious functional or cognitive impairment, or is (3) experiencing deteriorating physical or mental health because of the aging process. If relying on 1(A)(ii), a Defendant must also show that the medical condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

The Center for Disease Control ("CDC") recognizes his chronic kidney disease,[6] and morbid obesity[7] as comorbidities that increase the risk of severe illness from the virus that causes COVID-19. *See* People Who Are At Increased Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last February 24, 2021). The CDC further recognizes the Defendant's hypertension as a comorbidity that might increase the risk of severe illness from COVID-19. The Defendant's medical records clearly support his assertions that he has been diagnosed with these conditions and is currently being treated for them. Thus, the Court concludes that the Defendant has met his burden of identifying medical conditions increasing his risks of serious illness should he contract COVID-19. *See United States v. Harris*, No. 06-CR-30058, 2020 WL 3483559, at *3 (C.D. Ill. June 26, 2020) ("[H]aving chronic kidney disease of any stage increases the risk of severe illness from COVID."); *United States v. Somerville*, —— F. Supp. 3d ——, 2020 WL 2781585, at *8 (W.D. Pa. May 29, 2020) ("[H]ypertension and obesity have proven to be the most common comorbidities associated with increased risk of infection, grave illness, and death due to COVID-19.") (internal quotations omitted) (collecting cases).[8]

---

[6] As noted, the medical records do indicate that the Defendant has some unspecified kidney disorder. Whether that disorder rises to the level of chronic kidney disease is not something the Court can (or should) discern from the records. Out of an abundance of caution, the Court will assume the CDC would recognize this condition as a comorbidity that increases the risk of severe illness from the virus.

[7] The Defendant asserts that he has prediabetes and a heart condition. However, the medical records do not show either of these conditions are present.

[8] Defendant also maintains that his race (he is African American) may elevate the risk of contracting COVID-19 and suffering severe illness. (ECF No. 96 at 8). While African Americans have suffered a disproportionately high rate of hospitalizations and deaths from COVID-19 compared to the overall population, race itself generally is not considered a risk factor. *See United States v. Beasley*, No. 13-10112-3-JTM, 2020 WL 5077383, at *1 (D. Kan. Aug. 27, 2020) (statistics show COVID-19 disproportionately affects African-Americans, but explanation may be that African-Americans disproportionately have underlying medical conditions which render virus dangerous); *United States v. Myers*, No. 18-20633, 2020 WL 4934343, at *3 (E.D. Mich. Aug. 24, 2020) (inmate's race itself does not constitute risk factor for COVID-19 in same way as underlying medical condition does); *United States v. Green*, 2020 WL 3642860,

But, the "extraordinary and compelling" analysis does not end there. The Commentary to § 1B1.13(1)(A)(ii) requires the Defendant to also demonstrate that his medical conditions "substantially diminish" his ability to provide self-care within the environment of a correctional facility and that his medical conditions are of such a nature that "he or she is not expected to recover." The Defendant has not done so here. If anything, the Defendant has demonstrated an unwillingness to comply with the medical professionals treating him and a complete disregard for his own health and safety due to his personal choices. Medical professionals at the BOP can only do so much; they can counsel, monitor, diagnose and prescribe medications to treat the Defendant's conditions. And that is precisely what they have done in this case. All, it appears, to no avail as the Defendant, as recently as September 2020, had to be placed on a pill line to ensure his compliance with his medication protocol. While the Defendant has several serious medical conditions, it appears that only his medical providers are taking them seriously. *See* Gov't Ex. 1 at 3 (Defendant quoted as saying: "Yeah I've been skipping out [on medications]; I'm not stressed about it."); Gov't Ex. 2 at 2 (provider noting that Defendant not on any diet or exercise regimen and quoting Defendant as saying to provider "at least you have a sense of humor."). All this said, the Defendant has not demonstrated that any of his conditions prevent him from engaging in self-care to manage them within the prison setting nor has he demonstrated that he has not received adequate care while incarcerated.

The Defendant also alludes to his conditions of confinement limiting his ability to socially distance and otherwise restricting his liberty in ways creating additional stress on his health. The

---

at *4 (W.D. Pa. July 6, 2020) (denying motion for compassionate release for 39-year-old defendant, explaining that while data suggests that African-Americans have been disproportionally affected by COVID-19, it is unclear whether race is an independent risk factor or whether adverse outcomes are caused by other factors). Thus, the Defendant's race does not tilt the scales in favor of compassionate release.

Court acknowledges that in-facility movement has been understandably curtailed by the BOP due to COVID-19 and that social distancing is difficult in the institutional context. The Government's brief cites ongoing efforts by the Bureau of Prisons to take serious and substantial steps to reduce the spread of COVID-19 within its facilities. *See* Federal Bureau of Prisons, COVID-19 Action Plan: Phase Seven (posted on May 20, 2020), https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp last visited February 24, 2021); see also, BOP COVID-19 Modified Operations Plan, https://www.bop.gov/coronavirus/covid19_status.jsp (updated November 25, 2020). But even prior to these restrictions being in place, the Defendant showed little resolve to engage in the type of lifestyle modifications or compliance necessary to aid his own health. The Defendant has not suggested, or in any way indicated, that he intends to do what is necessary to comply with the medical providers' advice inside the BOP or out.

The Defendant has additionally expressed concern about the ability of the BOP to contain the COVID-19 virus, a concern that is not borne out in the statistics from the facility. As of the date of this Opinion and Order, Gilmer FCI, a facility housing 1,400 inmates, has one positive inmate and 4 positive staff members. A total of one inmate death has been recorded, and a combined 352 inmates and staff have recovered. These numbers support the conclusion that the BOP has managed the risk in an acceptable manner. *See United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release.").

Finally, setting aside the above discourse as to whether a compassionate release petitioner has at least some marginal obligation to maintain their own health and follow the advice of medical professionals while incarcerated, see *United States v. Tranter*, No. 1:17-CR-22-HAB, 2020 WL

9

3841268, at *4 (N.D. Ind. July 8, 2020)(denying compassionate release for a defendant's poor life choices as it allows "an avenue for defendants to create grounds on their own" that serves to "cheapen the concept of extraordinary and compelling circumstances."), in this case, even if the Court was inclined to find that the Defendant's health issues constituted an "extraordinary and compelling" reason justifying release, the Court concludes that his release is inappropriate in light of the factors set forth in § 3553(a) and the corresponding danger he presents to society if released prematurely.

The Court observes that the Defendant has a long history with the criminal justice system dating back to his juvenile days. His criminal history score was calculated to be 14 – which included two points because, at the time he committed the present offenses, he was on parole in a state court matter. As noted at the outset the Defendant's offense conduct was serious; he was part of a large drug trafficking operation responsible for distributing 30-40 kilograms of cocaine. More aggravating is the fact that the Defendant committed the instant offense after completing a 15–year sentence imposed for dealing cocaine. While the Court imposed a lengthy sentence of 312 months, it did so after taking into account all the relevant factors. The sentence was imposed to reflect the seriousness of the offense, promote respect for the law as well as to afford adequate deterrence and to protect the public from further crimes of the defendant. As the Government points out in its response, to further reduce the Defendant's sentence would vastly undercut deterrence to others engaged in drug trafficking activities and would be inconsistent with the sentences imposed in similar cases. Accordingly, the Court concludes that the significant sentence reduction the Defendant seeks would greatly undermine the above statutory purposes of sentencing.

In sum, this Court does not minimize Defendant's health risks, but concludes that Defendant has not met his burden for compassionate release especially considering Defendant's offense and serious criminal history, and in light of the BOP's ongoing efforts to mitigate the impact of COVID-19. Because this Court does not find extraordinary and compelling circumstances exist for the Defendant's release and a reduction of sentence is inconsistent with the § 3553(a) factors, Defendant does not meet the criteria for compassionate release and his motion is DENIED.

## **CONCLUSION**

Based on the foregoing, the Defendant's Motion (ECF No. 275) is DENIED.

So ORDERED on February 24, 2021.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT